Mr. Williams for the appellant and Ms. Johnson for the athlete. You may proceed. May I please the court? I said Johnson. My name is James Ryan Williams. And on behalf of the Office of the State Appellate Defender, it is my privilege to represent Mr. Dralle before this honorable court. Mr. Dralle was convicted of armed violence, which was predicated on subsection 832 stalking. In relevant parts, subsection 832 requires proof of at least two separate occasions of surveillance, and it requires proof of at least two separate occasions where the victim was placed in the reasonable apprehension of harm. At trial, the state only proved a single occasion where Ms. Ambergy was placed in the apprehension of harm, and it only proved a single occasion of surveillance. Surveillance is defined in relevant part by the statute as remaining present outside the victim's vehicle. The state claims that Ms. Ambergy was placed under surveillance on three separate occasions, all of which occurred at the exact same place, Miller Park, and all of which occurred at essentially the same time. And I say this because the record indicates that Ms. Ambergy first arrived at Miller Park at 1234 p.m., and that Mr. Dralle was arrested 26 minutes later at his home at 1 p.m. So the three allegedly separate occasions of surveillance all occurred in no more than 26 minutes, and again, they all occurred at the exact same location, Miller Park. Really, though, the three allegedly separate occasions of surveillance all likely occurred within mere minutes. And I say this because after the final alleged occasion of surveillance, Mr. Dralle ran to his car that was parked just outside the park, and the witnesses, the Browns, followed him. They watched as he got into his vehicle, and they wrote down his plate number. And then they drove to the Bloomington Police Department and provided the police with the plate number. The police then ran the plate and determined that the vehicle was indeed registered to Mr. Dralle. They got his address, and they dispatched a couple of police units out to his home where he was arrested at roughly 1 p.m. So considering that all of this happened in just 26 minutes, and considering everything that happened after the final occasion of surveillance, it seems likely that this entire incident lasted no more than perhaps 10 minutes. Now, the state has... Do you have a case that would indicate that surveilling her once or twice or three times within the same 26-minute period doesn't qualify for... Because he looked at her once, went away, looked at her again, went away. I mean, there's no case precisely on point, Your Honor. But my basic argument to that point is just simply that because this all occurred in a very close period of time, and because it all occurred at the exact same location, we essentially have one single occasion. You know, we're not dealing with acts here. We're dealing with occasions of surveillance. And in that respect, the stalking statute seems to be, based on my research, something of an outlier in the criminal code. And its use, its specific use, that is, not only the word occasion, but the word separate. So it's requiring separate occasions. And the state partitions these... Well, isn't it correct, though, that he drove by the first time, identified the car and her, and then left, made a loop around, and came back? Why isn't that two occasions? Well, the record's not clear that he made a loop. The record indicates that he drove by at least once, perhaps twice. And another instance in the record, he indicates, strangely and hypothetical, that perhaps he drove by three or four times. But nonetheless, he is continually remaining in close proximity to her. This is a continuous occasion of surveillance. And again, it's important to remember that all of this happened in a very short period of time. So even if he left, as the state claims, he couldn't have went very far, because, again, we're dealing with mere minutes here. Well, counsel, putting that issue aside, you still have the issue of whether or not the victim was placed in reasonable apprehension of immediate or future bodily harm. Can you talk about that a little bit? I mean, obviously she was when a gun was pointed at her through the window, but what about that aspect of it, with respect to the other two instances of supposed surveillance? With respect to the placing the victim in the apprehension of harm on two separate occasions, I mean, there is no doubt that pointing a firearm at her would indeed place her in the apprehension of harm. But as this Court has interpreted the statute, and I want to point out we're dealing with the exact same language here. The statute has, I believe, since the Nakajima case, the statute has been renumbered. But nonetheless, in Nakajima, this Court interpreted the precise language at issue and held that, as employed in the statute, the language on at least two separate occasions relates not only to the acts of surveillance, but also to the particular apprehension felt by the victim. And here the record is quite clear that there was only a single instance in which Miss Ambergy was placed in the apprehension of harm. And for that reason, the State argues that this Court should reconsider its holding in Nakajima. The State asserts that this Court's holding actually requires the victim to experience more harm before being protected by the statute. But the statute does not require the victim to experience any harm. Rather, it merely requires showing that the victim was twice placed in the mere apprehension of harm. And the standard for what constitutes placing a victim in the apprehension of harm is actually remarkably low, and reasonably so. And it can often be satisfied by the mere sight of the defendant in a public place. So again, we don't have two separate occasions where the victim was placed in the apprehension of harm. And going back to the surveillance, we don't have two separate occasions of surveillance. The State essentially tries to argue, with respect to surveillance, that because Mr. Drahle left the park after driving by Miss Ambergy, but before approaching her, a second occasion of surveillance occurred when he returned, as the State describes it, an unspecified period of time later. But of course, we're dealing with mere minutes here, so this unspecified period of time is perhaps a single minute. And it's important to note that Miss Ambergy testified that she parked just off of Summit Street, which forms the eastern boundary of Miller Park. Mr. Drahle parked just across Summit Street on intersecting West Miller Street. So essentially, the State argues that basically because he crossed the street when he returned an unspecified period of time later, an entirely new and separate occasion of surveillance occurred. But again, it's important to point out that because of the tight time frame here, Miss Ambergy and Mr. Drahle continually remained in close geographic proximity to Miss Ambergy during these three allegedly separate occasions of surveillance. The State also attempts to partition these mere minutes into distinctly separate occasions by noting that Miss Ambergy saw Mr. Drahle, the record indicates that she saw him in her rearview mirror, he then left her sight before approaching her again from behind. So even though all of this happened in mere minutes, and although he continually remained present just outside of her vehicle, the State nevertheless claims that these occasions of surveillance are even further divided by the victim's own perception. Such a theory would seemingly support separate occasions of surveillance as occurring any time the victim blinks, if we're going off the victim's own perception. And it just seems unreasonable to contend that separate occasions of surveillance indeed occur, or can occur that is, at the exact same place at essentially the same time simply because of minor variations in the defendant's relative geographic proximity to the victim or because of minor variations in the victim's own perception. And it's for that reason that I argue that separate occasions at a minimum require at least two distinctly individual and non-continuous incidents. And incidents are distinctly individual and non-continuous when there is appreciable difference in the relative time and or location of each incident. And I say this because in every single Illinois case that I have found, there was indeed such an appreciable difference in the relative time or location of each separate occasion of surveillance. That's exactly what made them separate. Here, an appreciable difference in the relative time simply does not exist when the three allegedly separate occasions of surveillance all occurred within mere minutes. The legislature specifically included the word separate and occasion in the statute for a reason. And it seems that that reason could not have been to invite the state to arbitrarily carve up what is likely a ten-minute incident into three distinctly separate occasions of surveillance by focusing on what are completely insignificant variances in what is continuous conduct. The state's proposed definition here that these slight variations in conduct suffice to divide conduct into separate occasions is completely unworkable because it would essentially convert a simple assault into felony stalking. As this court noted in Nakajima, subsection A-3-2 uses the traditional definition of assault. So essentially in function under subsection A-3-2, two assaults equals felony stalking. But one assault is just that, an assault. Furthermore, the statute's current construction makes sense. With respect to the placing the victim in the apprehension of harm, as this court has interpreted, under subsection A-3-1, which is not at issue here, but it's a sister subsection, stalking can occur in two different ways. Either where there's an actual threat coupled with separate occasions of surveillance, or where there's not an actual threat, stalking can nevertheless occur based upon a pattern of conduct from which a threat can be implied. So in such a case where there's no actual threat, stalking can nevertheless occur based upon multiple acts. Well, under subsection A-3-2, which we're dealing with here, it similarly does not involve an actual threat. And thus reasonably requires at least two separate occasions where the victim is placed in the apprehension of harm. Again, without requiring the victim to twice be placed in the apprehension of harm, simple assault essentially becomes felony stalking. Finally, Mr. Darley had the fundamental right to be informed of the nature and the cause of the charges against him. And the state did not charge that he twice placed Ms. Ambergy in the apprehension of harm. And it is fundamentally unfair to allow the state, now aware of its mistake, to attempt to change or conform its theory on appeal. Had Mr. Darley known of these theories that the state now raises, he could have addressed them at the court below. And with respect to the theories that the state now raises in an attempt to meet its trial burden now on appeal, the state first argues that one is placed in the apprehension of harm when one merely becomes suspicious of misfortune. And with that definition, the state argues that Ms. Ambergy was placed in the apprehension of harm when she simply clicked the block icon on Mr. Darley's profile, as she admitted she did any time she was simply not interested in meeting someone. Well, mere disinterest in meeting someone certainly doesn't equate to placing one in the reasonable apprehension of harm. And in its second attempt to meet its trial burden on appeal, the state argues that because Ms. Ambergy noticed Mr. Darley behind her car just before he approached her, she became aware of her surroundings. And because she became aware of her surroundings, she was placed in the apprehension of harm. But simply noticing unusual behavior, as she did, does not equate to being placed in the apprehension of harm. And if indeed his behavior did place her in the apprehension of harm, it seems unlikely that she would have rolled down the window and greeted him when he ultimately approached her car. Is that an inference that the trial court could have made, that it placed her in reasonable apprehension of harm? Or does she actually have to testify that it did, in fact, cause her to be apprehensive? Because she says things like, he was wearing a face mask and he just looked out of place, he looked suspicious, it was kind of weird, it was obvious, I noticed him, that observation made her aware of her surroundings. I mean, could it be an inference that the court could draw that that reasonably made her apprehensive? Well, to your first question, Your Honor, she does not have to specifically testify as to being apprehensive. The court can infer it based on the facts. But the simple fact, I mean, we're essentially dealing with assaults here, as this court has interpreted. And her noticing unusual behavior, him walking in the park and, you know, wearing a mask, and I guess to be clear, he wasn't actually wearing a mask necessarily. The witnesses had kind of inconsistent testimony in that respect, but one said that he pulled his shirt up and the other one said that he was maybe wearing a bandana. But nonetheless, we're dealing with, essentially we're dealing with assaults here. And this sort of behavior seemingly would not suffice to constitute an assault in and of itself. Anyhow, the fact is, the state failed to prove at least two separate occasions of surveillance and the state failed to prove at least two separate instances where Ms. Amberdee was placed in the apprehension of harm. Failure in either respect requires reversal of Mr. Drahle's conviction for armed violence. And unless this court has any questions with respect to Argument 3, I would like to move on to Argument 4. And I would just respectfully request that this honorable court reverse Mr. Drahle's convictions. Thank you very much. Oh, I'm sorry, you're on. As to Count 2, when we talk about the person commits stalking and he or she knows or should know that the course of conduct that was engaged in would cause a reasonable person to fear for his or her safety, are we looking at what the perpetrator knows or are we looking at what the victim knows? Because the state, I'm sorry, you argue that she couldn't have feared because she didn't realize that he had created a fake facade as far as who he was and all of that. So how could she be afraid? Whose perspective are we coming from with that? Correct, Your Honor. I inadvertently included a misstatement along my opening brief, which the state correctly pointed out, and I addressed it in my reply. But you're correct. It's actually viewed from the defendant's perspective and what he should have reasonably known as opposed to what she subjectively felt. Are there any further questions? I don't believe so. We'll have additional time on rebuttal.  You're welcome. Thank you. May it please the Court. Excuse me. Counsel. Mere minutes. Geographic proximity. Minor variations. These are words that were repeated a lot here. And it was said that these words and the fact that the statute speaks that the acts are to be separate, that it was an intentional use of the word separate, and that the actions here happened too close in time to be separate. Use of the word separate was intentional, but I would also submit to you that not using the word continuous or not inserting in there a temporal limitation was also intentional. Addressing first the issue of whether there were two instances when the victim, Ms. Ambergay, was placed under surveillance. The defendant concedes that he participated in multiple acts. The pacing behind the car, the circling repeatedly up to four times around the car, and the approaching the car and pointing the gun. He concedes that this was at least one occasion of surveillance. But then this is where the argument goes off track. He recognizes in his briefs that the courts have consistently said there is no minimum time frame when you will find an occasion of surveillance. And Daniels and Curtis and all the cases that I cite to support that. And in Curtis it was most obvious because the victim had called the police when I believe it was an ex-boyfriend, possibly ex-husband, had been contacting her repeatedly and threatening her if he didn't see his child. Fearful of this, she contacts the police and they set up a sting essentially where they'll go to a designated place. She will tell her ex that she will let him see the child. As he walks to the car, she is to put the car in reverse and drive away. That is exactly the way it went down. He went to the location. He walked toward the car. Walked toward the car. The case does not say he reached the car. He walked toward the car. She put it in reverse and drove away. And the court said that was sufficient. And part of the reasoning was that this is a statute that differs from assault because it's meant to prevent the harm. It's meant to put into place protections for victims before it reaches this higher escalation of an assault. Could I ask you about that analysis then? And I want you to think of this hypothetical, which is the defendant is alleged to have stalked the victim by peering through a window into her home. And he is alleged to have lifted his head up and peered over the windowsill and observed the victim and then crouched back down below the windowsill. And then a minute later pops his head back up again and looks at the victim through the window. Are those two separate acts of surveillance such that that would justify conviction for stalking? I would say that you would need to know those circumstances first and not the circumstances that we have here. I want to be clear that the repeated driving... We know the facts. Okay. If it placed the victim in reasonable apprehension of harm, that is something for the trier of fact to determine if those were in fact separate occasions. And the courts have said that when the trier of fact does consider whether they're separate occasions, certainly that time frame, the lapse of it, or the existence of it is something that they get to take into consideration. But there are facts that would support that being two separate occasions, yes. Okay. So you would say that that conduct would be sufficient to justify a conviction under the statute? I would say there are circumstances when those facts would, yes. I cannot say just from that without more, but yes, there are times when those facts would support two separate occasions. If you also look at the plain language of the statute, the statute does not place, again, this temporal restrictions. The courts have said there is no minimum amount of time. The court here found the first occasion was that circling of the victim. And the defendant admitted in his interview he slowed significantly. He was able to see she was reading a book. He was able to see that she had her foot propped up there. So it wasn't as if someone just drove by them on the street. He was intentionally observing her and critically observing her to see these and make these observations. In terms of the record, did he admit to one or two times that he passed by? Or there was also this reference to three to four times. What do we know? We know that the defendant did not testify or put on a defense. But admitted into evidence was his video recorded interview with the police. And in that interview, and I did cite the exact time for reference if you want to watch the tape, he stated in there that he drove by as many as three or four times. That is the quote that he, that is the statement that he made in his videotaped interview. That was the first occasion. We're not, it wasn't alleged, it's not argued that each of those was a separate occasion. That's not the facts here. Then the second occasion that the court found, and the court acknowledged that it was close in time, is when he re-entered the park and he was observed by two witnesses approaching the car before he tapped on the window and threatened her with a gun. Those are two separate and distinct occasions. He had to leave the park. He had to park. He had to cross the street and re-enter the park. And it does appear that things did happen in a fairly short time span, but it was still enough time for him to drive by repeatedly, leave the park, park, come back in, pace behind her car, which is what the state argued was the third instance of surveillance, but the trial court didn't address it. Then apparently leave the park again because when Ms. Ambergy saw him coming to approach her car, her testimony was he was crossing the street and coming toward my car, which would suggest that between pacing and approaching the car, he again left the park. Now, I would like to point you to page three of defendant's reply brief, because this is the quote that I think is significant. Quote, each of the three alleged instances of surveillance could be considered separate acts because each without the other could arguably stand alone as an occasion of surveillance. That's my argument. There are standalone occurrences. There was a break of time between them, and there's not required to be any minimum break of time between those. Despite recognizing there is no minimum time, though, again, we're talking around this, and we're inserting into the statute language that doesn't exist. We are inserting a continuous requirement and an appreciable amount of time. That is not language found anywhere. And again, I do recognize that in the other cases, there was more of a break of time between the instances than there was here. But it still comes back that in those cases they even said the fact that there was a break is not an indication that there must be a minimal amount of time. And if you look to the Daniels dissent, which I also mentioned in my brief, one of the justices there was arguing that there should be read into the definition of an occasion of surveillance a continuation and a continuous behavior. And the majority justices flat out rejected it and said, we have a statute that defines this and says that an occasion of surveillance is remaining present outside of something. Therefore, it would be improper, and we are not going to look outside of the statute for a definition different than the one that we were provided by the legislature. Well, and notwithstanding, then, this potential concession that these constitute three separate occasions. And assuming that we abided by our precedent, NACAGEMA, then there would need to be at least two separate occasions of reasonable apprehension. And defendant is saying you don't have the second one. If you stay with NACAGEMA, and I would like the opportunity to make the argument you shouldn't, but if you do, I think we did still prove our point. We did still prove at least two occasions of reasonable apprehension. We have the concession that pointing a gun at her was one occasion. But then we also have the evidence that there was a series of opportunities where he approached her through this website of plentyoffish.com, and she rejected him at each turn. Originally, he contacted her, and the screen name, the profile was adrolly7. She said she wasn't interested. His response, she considered to be very irate. In the interview with the police, he said, I was blunt. I think her excuse was bogus. And he acknowledged that maybe it was offensive to her. Then he contacted her a couple of months later. She had been off of the site because she had entered into a relationship, and she put her profile back on, and he contacted her again. And yes, she immediately blocked it. Then, though, the evidence that was presented and that the state presented during the trial was that after that, although she didn't know he was contacting her as built to the max, what we do know is when she discovered that he had contacted her under this fictitious profile, fake picture, lured her to the park, what her response to that was to go back, she testified she went back on that website of plentyoffish.com once. She deleted her profile, and she removed her profile and never visited another online dating site. The reason that this is also a circumstance that should be considered in making that inference that you mentioned, they are, the court is allowed to make, to infer a reasonable apprehension of harm, is because the other testimony was that when her relationships ended, she always went back to the websites. She testified she had tried several. Some were more expensive. Some were less expensive. But following this occurrence with defendant, where it escalated, and he pursued her, and despite her multiple rejections, he continued to the point of deceptively pursuing her and ultimately threatening her, based on that, she removed her profile and she pretty much abandoned her options of finding someone online. But aren't we looking at whether or not she was in reasonable apprehension at the time, not, I mean, you know, hindsight is 20-20. The reasonable apprehension does not have to be, the case law says it does not have to be directly connected to the surveilling and the following. It is an inference from the overall circumstances, and I believe that that is a circumstance in addition to the fact that she had blocked him when he was candid about his identity. And then blocking all possible suitors out of a, I believe the inference is, a fear for her safety, a reasonable apprehension, apart from the gun even. Finding that this gentleman had pursued her deceptively, and that prior to the gun, he had engaged her in very personal conversations about sexual habits. He had pressured her into providing him with semi-nude photos and somewhat criticized her for not providing full nudity pictures. All of this is prior to the gun. And all of this is part of what figures into, the inference would be, her decision to say online dating is no longer even an option for me because I have this reasonable apprehension that when I turn away suitors I am not interested in, they're still going to come after me in a deceptive way. But I think it was a fair inference. I guess, counsel, what I'm saying, the flip side of that is, in spite of all that going on, she did send photos, she did show up at the park, she agreed to meet this person, so what inference is to be drawn from that? I mean, it seems to me that you're saying, because of this turning out so horribly, I've learned my lesson, I'm not going to ever do that again, but are you really looking at whether or not she was in reasonable apprehension at the time the initial conduct was going on outside of the culmination at the park? Well, I don't agree that she agreed to meet him at the park. She agreed to meet somebody totally different at the park. She agreed to meet someone who was posing as Bill Tremax. Correct. Different persona, different picture, and everything else. And I do think that coming at this, again, it was a reasonable apprehension of harm, looking at the circumstances as a whole. When did she form that reasonable apprehension of harm? I think it was a continuing thing. She clearly, apart from the gun. Reasonable apprehension of harm can be developed depending on who you are in many different ways, but reasonable is that objective standard. So when did you first develop that? It is reasonable to be apprehensive. At the time that you realize you are being pursued deceptively, it can be reasonable to be in apprehension of harm when you find out somebody is continually pursuing you that you have previously rejected. My question, though, is when do you assert that she developed that reasonable apprehension of harm? I understand the definition of reasonable, but when do you believe she developed that reasonable apprehension of harm? I believe she initially developed it on that second occasion when he contacted her and she rejected him. But I believe that that apprehension was made concrete and beyond a reasonable standard when she fully realized what had happened and she removed herself from being put in that position. I would like to address, though, why I would ask you to reconsider Nakajima. In Nakajima, this court did say that there had to be two experiences of a reasonable apprehension of harm. And going back to the original statute, it was required that there be a threat. The threat could cause a reasonable apprehension of harm, but a reasonable apprehension of harm without the threat would not allow the state to take any actions to protect the victim. There had to be a threat and there had to be these two instances of following or surveilling. A year after the original enactment, the legislature went back in with the specific goal of toughening this statute to make more protections for the intended victims. And in doing so, they made it that you still had to have two instances of following or surveilling, but now you could have a threat or a reasonable apprehension of harm. It's one, two following, and under A3A, a threat, or under A32, a reasonable apprehension of harm. When Senator Hawkinson was speaking not on the original enactment, but on these amendments, the language is clear. She was talking in terms of a singular reasonable apprehension and a singular threat accompanied by two acts or following. It was not, based on the floor hearings, intended that this language, which by the way, the language two or more occasion appears in the main heading for the statute in the general language. And then it breaks out again, A31 and A32. It was not in any of the discussions considered that this two or more would apply to only one of those and not the other. If it applied to one, it applied to both. But it didn't because they were speaking in terms of singular, singular threats, singular apprehension. And in Nakajima, in finding to the contrary, that that two or more did apply to the reasonable apprehension. This court, although not this panel, put emphasis on this language in the threat, that the threat could happen at any time. Based on the amendments to the statute, that phrase, at any time, was given, I would argue, inappropriate significance. Your argument has logical appeal. And I think you set it out very well in your brief. Nakajima was decided 16 years ago. Have there been any other cases, any court decisions that have criticized the Nakajima interpretation of the statute? And have there been any attempts, excuse me, have there been any amendments to the statute since 1998? I have not had any cases criticizing the analysis. And there have not been amendments to that particular part. Maybe not the particular part, but the stalking statute generally since 1998. I believe there have, yes. Has there been any discussion to address the Nakajima holding, to make clear that it only requires one occasion of apprehension? No, there has not. But I believe, they believe they made it clear when they made the amendment. The at any time is a reference to the fact that after the amendments, the threat did not have to happen prior to the stalking, which is what was required originally. Now the threat could be made at any time. That is not the case when you have a reasonable apprehension of harm, but there hasn't been a threat, which is what 832 addresses. You have to have some other act, which is that surveilling and following to create that reasonable apprehension of harm. The phrase at any time is not relevant in that particular section. At any time was the reference to when the threat had to be made. It was not a reference to the number of times a victim must reasonably be in apprehension of harm. It was when the threat would have to be made and now no longer have to be made before or after the following surveilling. I see my time is nearly up. If you have any additional questions. Thank you very much. I would just like to try to briefly address a couple of points. Admittedly, there is no minimum period of time for an occasion to occur. But what I'm arguing here is that because the various acts, as the state calls them, are bound by continuity. They're all happening at the same time. This is a single occurrence. Although, admittedly, perhaps they could be independent acts and perhaps they could, if one happened without the other, they could arguably be independent occasions of surveillance. Nevertheless, because they all happen together at basically the same time in the exact same place in perhaps less than ten minutes, they're bound by continuity and therefore only give rise to a single occasion of surveillance. And with respect to your concerns as to the driving by three or four times, I would just like to clarify that part of the record. My client does not actually admit that he drove by three or four times. When he says that, what's happening is he doesn't know at that point in time that the Browns had followed him and got his plate. And so he's merely speculating as to how somebody might have got his plate. And so what he argues is, well, if somebody were to drive by three or four times, that'd be kind of unusual and maybe that's how they got my plate. But I wasn't the one who actually approached her. So he doesn't actually admit that he drove by three or four times. He merely speculates, almost as if he's creating an alibi for himself in that respect. As to the state's discussion regarding Justice Hartman's dissent in... I don't know where the case name escapes me right now. I believe it was Daniel. But anyhow, his dissent is primarily focused on the fact that the charging instrument did not apprise the defendant of the charge against him. This notion that he was talking about continuous conduct and that was rejected by the court, the only mention, as I recall, of continuous conduct in that dissent was specific reference to a dictionary definition of stalking that he uses. He doesn't advocate that continuous conduct is necessary. There's really nothing there. So I'm not really sure why the state's focusing on Justice Hartman's dissent in that respect. Moving on to whether blocking, Ms. Ambergy's choice to block Mr. Drahle would place her in the reasonable apprehension of harm at that time. First of all, I should point out, Mr. Drahle had no idea that he had been blocked. The website does not indicate that you've been blocked. He contacted her. She responds back. He responds with what she describes as an irate message, but it should be noted that message is not in the record, and she offers nothing as to why she described that message as irate. The significance of the irate message really is only being raised for the first time here on appeal. And with respect, finally, with respect to subsection A-3-2, as this court reasoned in Nakajima, and I should first point out the language has not changed since that time, as this court reasoned in Nakajima, subsection A-3-2, unlike subsection A-3-1, does not contain a temporal reference. Because it does not contain a temporal reference, this court reasoned that the language on at least two separate occasions also was intended to modify subsection A-3-2 as well. Does the court have any further questions? I don't believe so. Thank you all very much for your time. Thank you. We'll take this matter under advisement and stand in recess until the readiness of the next case.